**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LAURENCE H. RABÉ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 08 C 6012** |
| | ) | |
| **UNITED AIR LINES, INC.,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Laurence H. Rabé worked as a flight attendant for Defendant United Airlines, Inc. ("United") from 1993 until 2008, when she was terminated after an investigation revealed she had violated United's rules governing the use of employee travel tickets.   Plaintiff claims that United terminated her employment based on her age, national origin, sexual orientation, and in retaliation for complaints about employee discrimination.   Rabé seeks to recover under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* ("Title VII"); the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"); and the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq.* ("IHRA").   United moved for summary judgment on all counts. For the reasons explained below, Defendants' motion for summary judgment [110] is granted.

<u>**BACKGROUND**</u>

Plaintiff, born on April 5, 1967, is a French citizen and a lesbian.  (Pl.'s Rule 56.1(B)(3) Resp. to Statement of Undisputed Facts [146], hereinafter "Pl.'s 56.1," ¶ 2.)  United initially hired Plaintiff in November 1993 to work as an international flight attendant based at the Charles De Gaulle Airport in Paris.  (*Id.* ¶ 4.)  In 1997, she voluntarily transferred to work as an international flight attendant from United's Hong Kong base.  (*Id.*)  Plaintiff took a voluntary furlough from her employment with United in May 2002, and remained on furlough until she was recalled by United in early August 2005.  (*Id.* ¶ 6.)  After her return to United in August 2005, Plaintiff's supervisors in Hong Kong were Josephine Lau and Alwin Fernandes; the Hong Kong base managers were Lisa

de la Fleur and Jennifer Wissig. Though she had returned from furlough, Plaintiff worked only three round-trip flights, all based from the Hong Kong base, from August 2005 to September 2007, when Fernandes prohibited Plaintiff from working pending an investigation of her travel (discussed below). (*Id.* ¶ 7.) Plaintiff worked only three trips during that two-year period, because, as permitted by the terms of the collective bargaining agreement ("CBA") between United and the Association of Flight Attendants ("AFA"), she allowed others to fly her assigned flights. (*Id.* ¶¶ 5, 7.)

## I.     United's BP-3 Travel Policies

United routinely provides its flight attendants with "non-revenue positive space business passes," or tickets, for specific purposes. (*Id.* ¶ 8.) One such type of ticket, a BP-3 pass, guarantees an attendant a free seat that is removed from inventory, that cannot be bumped due to customer demands or flight attendant seniority, and for which the service fee and/or taxes are paid by United. (*Id.* ¶ 9.)[1] Pursuant to Section 22.L.1 of the CBA, BP-3 passes are issued for specific, limited purposes, including (1) "Purser BP-3" tickets to enable pursers[2] to attend mandatory training meetings and (2) "Annual BP-3" passes to facilitate employees' return to their former domicile or place of residence annually to conduct personal business. (*Id.* ¶¶ 8, 16.) United requires BP-3 travel to be approved by a supervisor or coordinator, and forbids "deviation without authorization" from approved BP-3 ticketed trips. (*Id.* ¶¶ 12-13.) The authorized routing for a BP-3 ticket is generally the most direct routing to and from a destination. (*Id.* ¶ 12.) Defendant asserts that Plaintiff violated company policies by improperly using Purser BP-3 passes and Annual BP-3 passes that the company issued to her. (Def.'s Rule 56.1(B)(3) Statement of Undisputed Facts

---

[1]     United also asserts that BP-3 passes guarantee a business or first-class seat and that they cannot be sold. Plaintiff disputes these propositions (Pl.'s 56.1 ¶ 9), but they are not material to this motion.

[2]     A "purser" is a lead flight attendant on a flight. (Pl.'s 56.1 ¶ 15.)

[112], hereinafter "Def.'s 56.1," ¶¶ 37-42.) Specifically, Defendant contends that flight attendants may not "drop legs" of a BP-3 authorized trip (that is, fail to board a flight for which a BP-3 ticket has been issued), but Plaintiff insists that there was no such policy and that "United has failed to discipline scores of employees who have failed to board all portions of BP-3 authorized travel." (*Id.* ¶ 13.) It is undisputed that Plaintiff was the first Hong Kong flight attendant disciplined for allegedly misusing BP-3 passes. (Pl.'s Opposition to Mot. for Summ. J. [145], hereinafter "Pl.'s Opp.," at 5.) Plaintiff asserts that United was aware of BP-3 abuse prior to Plaintiff's termination based on two pieces of evidence: (1) a 2005 e-mail from de la Fleur to other managers in which de la Fleur suggested that employees may have been inappropriately saving BP-3 passes for the December holiday season (*id.* at 3); and (2) a 2007 e-mail correspondence between individuals investigating Plaintiff's alleged misuse of BP-3 passes (discussed below), in which one investigator suggests Rabé should be held accountable "if she can not substantiate her actions even though we haven't done that consistently in the past." (*Id.* at 6.)

A round-trip Annual BP-3 pass is granted to each flight attendant who voluntarily transfers to an international domicile, as Plaintiff did, to enable the attendant to conduct personal business at the location of his or her former residence once a year. (*Id.* ¶ 17.) Defendant asserts that a flight attendant's former place of residence is determined by her place of residence at the time she transferred. (Def.'s 56.1 ¶ 17.) A letter written by Frank Colosi, Director of Labor Relations, to United's "Managers Onboard Service"[3] in April 1999 specified that: (1) Annual BP-3 passes must be issued for travel between the same two locations; (2) such passes may only be issued for travel

---

[3]     In her Rule 56.1 statement, Plaintiff uses an alternative title in reference to the recipients of Colosi's letter: "Managers in Onboard Service." The parties did not provide a definition for either term. Lau testified, however, that her title at the time of her deposition was "manager, in-flight service" or "in-flight manager." (Lau Dep. at 4:15-24.) Previously, she served as a "supervisor of in-flight service." (*Id.*) Based on this context, the court assumes that (1) "Managers Onboard Service" refers to flight attendants with certain managerial responsibilities during flights, and (2) that Colosi's letter was distributed to those individuals.

between a flight attendant's new domicile or place of residence and the old domicile or place of former residence as recorded in the United company records; (3) the location of a former residence is determined by the primary permanent address of record at the time of transfer or the prior domicile location, if different; (4) passes should be written using the most direct route; (5) once a destination is identified, all subsequent passes must be to that same location for the entire duration of the transfer; (6) passes may not be altered; (7) passes may not be "split" (i.e., the employee may not use one segment for one trip and the other at a later time); and (8) alteration and/or abuse of the Annual BP-3 passes will result in disciplinary action, up to and including discharge. (Pl.'s 56.1 ¶ 18.) Lau, one of Plaintiff's supervisors in Hong Kong, testified that she had received the letter in 1999, but did not disseminate it to the flight attendants she supervised.[4] (Lau Dep., Ex. B to Def.'s App. of Evidentiary Materials in Supp. of its Mot. for Summ. J. [114], hereinafter "Def.'s App.," at 108:20-109:9.) Plaintiff claims never to have seen the letter herself. (Pl.'s 56.1 ¶ 18.)

United provides all flight attendants with a Flight Attendant Operations Manual ("FAOM") containing rules, policies, and procedures. (*Id.* ¶ 19.) The FAOM specifies that, absent mitigating factors, a flight attendant will be terminated for abuse or misuse of travel benefits. (*Id.* ¶ 20.) Plaintiff admits that it was her responsibility to seek clarification regarding United's travel policies if she did not understand them or needed clarification. (Rabé Dep., Ex. H to Def.'s App. at 88:13-89:15.) She also admits she understood that misusing travel passes could result in "repercussions." (*Id.* at 107:17-108:10.) The FAOM imposes the requirement that reservations for non-revenue passes, such as BP-3 passes, should be promptly cancelled should travel plans change, and that "employees may not use Company business or business related travel for pleasure travel, commuting to and from work, personal financial gain, or in the interest of or

---

[4]     Plaintiff argues that the Colosi letter of April 1999 was received by Ms. Lau "more than a year before Plaintiff transferred to Hong Kong." (Pl.'s 56.1 ¶ 18.) This assertion, however, directly contradicts Plaintiff's acknowledgement that she worked out of United's Hong Kong base from 1997-2002. (*Id.* ¶ 6; Pl.'s Opp. at 2.)

furtherance of any other . . . organization." (Pl.'s 56.1 ¶¶ 23-24.)

In November 1999, when Plaintiff was working from the Hong Kong base, United distributed the November edition of *Peak Times*, the Hong Kong domicile's newsletter, to all Hong Kong flight attendants' mail boxes. That publication contained an article detailing rules for Annual BP-3 passes substantially as set forth in Colosi's April 1999 letter.[5] (*Id.* ¶ 29.)

## II.    Plaintiff's BP-3 Travel

Plaintiff listed a permanent address in France when she transferred from France to Hong Kong in 1997. (Pl.'s 56.1 ¶ 32.) Before her voluntary furlough period between 2002 and 2005, Plaintiff had always obtained Annual BP-3 passes to fly round-trip from Hong Kong, her domicile, to France. While Plaintiff was domiciled in Hong Kong, she had two addresses in United's system—one in France and one in Hong Kong. In 2000, Plaintiff filed an application for domestic partner benefits with United, this time listing her address in Los Angeles as her primary residence. (*Id.* ¶¶ 15, 44.) The benefits application identified both Plaintiff and her partner as female, and Lau signed the application as Plaintiff's supervisor. (Affidavit of Domestic Partnership, Ex. H to Tab A, Pl.'s App. of Evidentiary Materials in Supp. of Pl.'s Opp. to Def.'s Mot. for Summ. J. [147], hereinafter "Pl.'s App.") The next year, Lau instructed Plaintiff to change her primary residence back to France, because Plaintiff is not a United States citizen. (Pl.'s Opp. at 2.)

On December 15, 2005, Plaintiff changed her primary address in United's system from France to Hong Kong and then inquired about obtaining an Annual BP-3 pass to return to France.

---

[5]     The *Peak Times* article explained that: (1) the pass is intended to permit a flight attendant to return to his/her permanent residence to conduct personal business such as renewal of a driver's license or passport, monitoring real estate, or filing tax returns; (2) the pass is not intended for pleasure, commuting, or vacation travel; (3) the pass may only be written for travel from the new domicile location to either the location of the former residence (as determined by the primary permanent address the flight attendant had at the time of her transfer) or to the prior domicile location, if it is different; (4) the pass should take the most direct route; (5) once a destination is identified, all subsequent passes must be to the same location for the entire duration of the transfer; (6) the pass may not be altered; and (7) altering or abusing the pass could result in disciplinary action up to and including discharge. (Def.'s 56.1 ¶ 29.)

Plaintiff was notified that she was not eligible for an Annual BP-3 pass because France was no longer her primary address. She then changed her primary address back to France on January 3, 2006. (Def.'s 56.1 ¶ 35.)

On August 6, 2006, Plaintiff obtained a round-trip Purser BP-3 ticket from Paris to attend a Purser meeting in Hong Kong. The trip authorized her to travel a route from (1) Paris to Washington, D.C.; (2) Washington, D.C. to Los Angeles; (3) Los Angeles to San Francisco; (4) San Francisco to Hong Kong; (5) Hong Kong to Chicago; and (6) Chicago to Paris. (Pl.'s 56.1 ¶ 37.) After the training in Hong Kong, Plaintiff traveled on her BP-3 pass only as far as Chicago, abandoning the last leg of her flight from Chicago to Paris. She did not inform United that she was not going to complete the last leg, nor did she cancel the unused leg. (*Id.* ¶ 38.) Instead of using the last leg of her BP-3 pass to return to France, Plaintiff flew on a space-available policy—another class of employee travel benefit with its own set of rules—from Chicago to Los Angeles to spend time with her domestic partner. (*Id.*)

On October 30, 2006, Plaintiff once again changed her primary address, switching from an address in France to one in Hong Kong. (Def.'s 56.1 ¶ 36.) Two days later, Plaintiff inquired about using her Annual BP-3 pass to travel from Hong Kong to France to conduct personal business, and requested that her return trip from France to Hong Kong be routed through Los Angeles. United denied that request because it was not the most direct routing. Instead, on November 28, 2006, United issued Plaintiff an Annual BP-3 pass on a route from (1) Hong Kong to Chicago; (3) Chicago to Paris; (3) Paris to Chicago; and (4) Chicago to Hong Kong. (Pl.'s 56.1 ¶¶ 39-40.) Before boarding the first leg of this trip on November 30, 2006, Plaintiff booked a space-available ticket from Chicago to Los Angeles for later that day. After flying from Hong Kong to Chicago, Plaintiff abandoned the remaining three legs of the trip without cancelling them or informing anyone that she would not be using the subsequent flights. Rather than continuing on her authorized route, Plaintiff she flew on a space-available basis from Chicago to Los Angeles to be with her domestic partner.

6

(*Id.* ¶¶ 41-42.)  Plaintiff later changed her permanent address back to one in France on January 11, 2007.  (Def.'s 56.1 ¶ 36.)

In August 2007, Plaintiff asked Lau to issue her a BP-3 ticket to travel from her home in France[6] to a business-related Purser meeting in Hong Kong.  Rabé specifically requested that her travel be authorized through Los Angeles "like the previous year," a reference to Plaintiff's August 2006 routing through Los Angeles on her way from France to purser training in Hong Kong.  Lau responded that BP-3 travel could only be authorized through the most direct routing.  Prompted by Plaintiff's request, Lau reviewed Plaintiff's travel records to determine what Plaintiff had meant by her reference to "the previous year['s]" booking.  (Def.'s 56.1 ¶ 43.)  From her review of Plaintiff's records, Lau observed that Plaintiff had, over the previous two years, changed her address for short periods of time on several occasions, and that Plaintiff had not completed (but did not cancel) the Chicago-to-Paris leg of her BP-3 ticket for purser training in 2006.  At her deposition, Lau explained that she became concerned that Plaintiff was manipulating United's system to improperly obtain BP-3 tickets.  (Def.'s 56.1 ¶¶ 44-45.)  Digging further into Plaintiff's records, Lau discovered that Plaintiff had not completed three of the four legs of her Annual BP-3 pass from Hong Kong to Paris in November 2006, nor had Plaintiff cancelled the segments she did not use for that travel.  (Def.'s 56.1 ¶ 46.)  Lau was also puzzled that, on August 28, 2007, Plaintiff submitted an expense report for a parking pass at Los Angeles International Airport ("LAX"), though Plaintiff did not have a primary or secondary address listed there in United's system.  (Def.'s 56.1 ¶ 47.)  After Lau reported her findings to David Meisenheimer (the former Senior Staff Representative for labor relations in San Francisco), to Wissig, and to Fernandes, United began an investigation into Plaintiff's records.  (*Id.* ¶ 48.)  In addition to these individuals, Elizabeth Jacobsen (Inflight Contract Support Supervisor for San Francisco) and Eileen O'Rourke (former Senior Staff Representative Labor Relations for

---

[6]        Neither party explains how or when Plaintiff returned to France from her November 2006 visit to Los Angeles.

San Francisco) also participated in the investigation.  (*Id.* ¶ 49.)

### III.    Investigation into Plaintiff's Travel

As part of United's investigation, Fernandes met with Plaintiff six times between September 11, 2007 and December 30, 2007.  Plaintiff was permitted to have a witness at each of those meetings, and a witness did join her at every meeting after the first one.  (N either party has identified any of Plaintiff's witnesses.)  (Pl.'s 56.1 ¶ 50.)  During those conversations, Fernandes never directly asked Plaintiff about her sexual orientation.  Plaintiff asserts, however, that Fernandes asked her about why she had parking permits in Los Angeles "with a grin on his face" during a September 2007 meeting.  (*Id.* ¶ 52.)  Plaintiff later informed Wissig[7] of her sexual orientation and her belief that Fernandes was harassing and discriminating against her because of it.  Wissig replied that she would speak to Fernandes about the issue and instructed Plaintiff to talk to Wissig directly about the investigation if it made her more comfortable.  (*Id.*)  Beginning in September 2007 and throughout the investigation, Plaintiff was also prohibited from working scheduled flights, though she remained on Defendant's payroll.  (*Id.* ¶ 7.)

On November 12, 2007, while the investigation into her travel records was ongoing, Plaintiff wrote an e-mail message to AFA union president Jake Kande, claiming that she was being "persecuted" by Fernandes because of his Indian heritage.  (*Id.* ¶ 63.)  Kande responded that he did not believe Plaintiff's comment about Fernandes was appropriate, but that she should provide any evidence she had of alleged harassment or discrimination and the union would pursue the issue.  (*Id.*)  Four days later, Plaintiff sent Kande a second e-mail message, asking for help from the union in making a harassment and discrimination case against Fernandes.  Plaintiff attached an article about India's alleged prejudice against homosexuality to substantiate her claim that Fernandes, an Indian man, was "harass[ing]" her.  (*Id.* ¶ 64; Tab H, Ex. 43 to Def.'s App.)  Plaintiff

---

[7]      Plaintiff does not identify when or in what manner she and Wissig had this conversation.

did not provide the union with any other information to support her claim against Fernandes. (Pl.'s 56.1 ¶ 64.)

On December 8, 2007, Plaintiff wrote Wissig an e-mail again stating that she felt she was being harassed and potentially discriminated against by Fernandes. Wissig arranged a meeting with Plaintiff for December 30, 2007—the next day that Plaintiff was scheduled to be in Hong Kong. (*Id.* ¶ 65.) During that meeting, Plaintiff stated she felt she was being mistreated based on her sexual orientation and national origin. She cited Fernandes' Indian cultural background; a comment Fernandes made in 1997 about homosexuality being illegal in India; and his questioning her, as described earlier, about why she had a Los Angeles parking pass during the September 2007 investigatory meeting. (*Id.* ¶ 66.) Plaintiff nevertheless declined to complete a "Written Statement of Complainant" form at that time. (*Id.*)

During the investigation into her travel, Plaintiff admitted she had not flown on ticketed legs of her BP-3 authorized travel and had instead gone to Los Angeles in August and November 2006. Plaintiff disputes that abandoning those legs of her trips without cancelling them violated United's travel policy, as spelled out in *Peak Times*. That document states only that BP-3 passes "may not be altered." (*Id.* ¶ 53.) Ultimately, in a series of November 2007 e-mail messages, Jacobsen, Fernandes, Wissig, Meisenheimer, and O'Rourke all agreed that Plaintiff had violated United policies. Plaintiff's AFA union president, Jake Kande, similarly acknowledged in a February 2, 2008 e-mail that Rabé had violated United's Articles of Conduct by using BP-3 tickets to commute and by deviating from her original routing without authorization and without cancelling the unused segments. (Def.'s 56.1 ¶ 54.) During the course of the investigation, Wissig, the Hong Kong domicile manager, sent out two e-mail messages to Hong Kong-based flight attendants reiterating the rules for Annual BP-3 passes. (Pl.'s 56.1 ¶ 55.)

The same day that Plaintiff met with Wissig to discuss her discrimination concerns—December 30, 2007—Fernandes issued a "Letter of Charge," citing Plaintiff for violation

of United's Articles of Conduct by using her BP-3 tickets to commute in August and November 2006 to visit her partner in Los Angeles, failing to complete authorized routing of BP-3 tickets, and failing to cancel the unused portions of her BP-3 routings.  Specifically, the Letter of Charge alleged that Plaintiff violated (1) Article 5 by failing to complete the authorized routing and (2) Article 35 by failing to cancel segments of her BP-3 tickets.  (Letter of Charge, Ex. 4 to Tab D, Def.'s App.)  Article 5 prohibits the "[a]buse or misuse of any travel benefits," while Article 35 prohibits "any conduct detrimental to the company or which has the potential to adversely affect the company's relationship with customers, suppliers, employees or the public." (United's Articles of Conduct, Tab H to Ex. 12, Def.'s App.)  Pursuant to Section 26.A.1 of the CBA, the Letter of Charge also set a date (January 9, 2008) for a hearing on the allegations, to be held in Hong Kong.  (*Id.* ¶ 56.)

Plaintiff again wrote to Wissig on February 7, 2008, asking Wissig to "finalize the [internal harassment complaint] procedure started on December 30th [2007]."  (Pl's. 56.1 ¶ 67.)  Wissig asked Rabé to provide any documentation she had to support her discrimination and harassment claims and informed her that if her complaint were substantiated, it could affect the Letter of Charge hearing.  (*Id.*)  Plaintiff never completed her complaint and never provided additional information or documentation to United or the AFA; Defendant nevertheless proceeded to conduct a thorough investigation into her allegations, interviewing a number of employees, including Plaintiff.  (*Id.* ¶¶ 68-69.)  Wissig informed Plaintiff on March 10, 2008 that United's investigation had found no violation of the airline's Harassment or Discrimination Policy.  (*Id.* ¶ 69.)  Wissig's letter "strongly encouraged" Rabé to come forward if she felt she was subjected to retaliation, but Plaintiff never informed Wissig or anyone at United that she believed she was subject to retaliation.  (*Id.*)

Pursuant to the CBA, United held a hearing on the Letter of Charge on March 22, 2008. Jacobsen acted as the hearing officer.  On April 5, 2008, Jacobsen issued a Letter of Decision terminating Plaintiff's employment.  Plaintiff appealed her termination through her union (the AFA), which held an arbitration hearing in September 2009 and March 2010.  In a December 1, 2010

decision, the System Board of Adjustment panel upheld Plaintiff's termination, finding that she had knowingly violated United's Articles of Conduct. (*Id.* ¶¶ 56-60.)

Plaintiff is the only flight attendant from the Hong Kong base who has been disciplined and terminated for misusing her BP-3 tickets. (*Id.* ¶ 61.) The parties agree that United has disciplined and terminated flight attendants from other domiciles for misusing travel benefits. Plaintiff claims, however, that others not in her protected classes were disciplined less severely for substantially similar conduct. (*Id.* ¶ 62.) Defendant argues that Rabé has not identified any flight attendant outside of her protected classes who misused BP-3 passes and was not disciplined. Plaintiff claims, however, that she has offered comparators by providing, without explanation, a list of United Hong Kong employees who failed to fly a leg of a BP-3 pass. (*Id.* ¶ 77.) Plaintiff received this list in discovery, and neither party has explained how or when it was generated. There is no evidence that anyone at United was aware of the violations at the time they occurred.

## IV.    Administrative proceedings

Subsequent to her termination, Plaintiff filed charges of discrimination with both the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights. (*Id.* ¶ 70.) The EEOC charge—filed on July 30, 2008—alleges retaliation and discrimination based on age and national origin, while the state claim—filed on September 27, 2008—alleges retaliation and discrimination based on age, sexual orientation, national origin, and citizenship status. (*Id.*) Plaintiff received a right-to-sue letter from the EEOC. *(Id.* ¶ 75.) Though she did not receive the corresponding letter authorizing suit from the Department, Plaintiff argues that she exhausted her administrative remedies by proceeding through to a dismissal of that charge with the Illinois Human Rights Commission on June 13, 2012. (Pl.'s Opp. at 15.) Plaintiff filed two requests for review with the Commission; one in December 2009 and one in January 2011. (Ex. A to Def.'s Reply Mem. of L. in Support of Its Mot. for Summ. J. [151], hereinafter "Def.'s Reply," at 6.)

**DISCUSSION**

I.      **Standard of Review**

Summary judgment is appropriate where "there is no genuine issue as to any material fact" such that "the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Although intent and credibility are often critical issues in employment discrimination cases, no special summary judgment standard applies to such cases. *Majors v. GE Elec. Co.*, 714 F.3d 527 (7th Cir. 2013). In reviewing a summary judgment motion, the court construes the evidence and all inferences in the light most favorable to the nonmoving party. *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011). No genuine issues of material fact exist "when no reasonable jury could find in favor of the non-moving party." *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012).

II.     **Exhaustion of Administrative Remedies under the IHRA**

Plaintiff alleges that United subjected her to harassment and discrimination based on her sexual orientation in violation of the IHRA. Before reaching the merits of Defendant's summary judgment motion, the court must first address whether Plaintiff has exhausted her administrative remedies under the IHRA. *See Hankins v. Best Buy Co.*, 10 CV 4508, 2011 WL 6016233, *6 (N.D. Ill. Dec. 2, 2011) (dismissing IHRA claim for lack of evidence that plaintiff exhausted administrative procedures set forth in the IHRA).

The IHRA provides a comprehensive scheme of procedures and remedies for redressing human rights violations. 775 ILCS 5/1-101 *et seq.* Claims under the IHRA fall within the exclusive jurisdiction of the Illinois Department of Human Rights ("Department") and the Illinois Human Rights Commission ("Commission"). 775 ILCS 5/8-111(D) ("Except as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act."). Only after a complainant either (a) receives a final report from the Department or (b) the Department fails to issue its report within 365 days after the charge is filed,

12

may the complainant commence a civil action in circuit court.  775 ILCS 5/7A-102(D), (G)(2).  In either circumstance, the complainant must file her civil action within 90 days of the qualifying event. *Id.*  Where the Department dismisses the claim, the complainant may alternatively appeal the decision to the Commission.  775 ILCS 5/7A-102(D)(3).  If the complainant chooses that appeal route, however, she "may not later commence a civil action in a circuit court."  *Id.*  Following an appeal to the Commission, the complainant may only seek judicial review after a final order of the Commission by "filing a petition for review in the Appellate Court within 35 days [of the decision]." 775 ILCS 5/8-111.

Here, Defendant argues that Plaintiff did not receive a right-to-sue letter from the Department and, therefore, may not pursue a civil action under the IHRA.  (Def.'s Mem. in Support of Its Mot. for Summ. J. [110], hereinafter "Def.'s Mem.," at 7.)  Plaintiff does not deny that she never received a right-to-sue letter from the Department, but contends that she has exhausted her administrative remedies by appealing to the Commission, which ultimately sustained the Department's dismissal of her discrimination claim on June 13, 2012.  (Pl.'s Opp. at 15.)[8] Defendant counters that Plaintiff's appeal to the Commission precludes her from raising her IHRA claim before this court.  (Def.'s Reply at 6.)

Notably, Plaintiff has provided no evidence that the present suit was filed properly in this court under the procedures of the IHRA.  The IHRA allows complainants to commence civil actions in state court within 90 days of either the issuance of the Department's report or, if the Department fails to issue a report within a year, within 90 days of the conclusion of that one-year period.  775 ILCS 5/7A-102(D), (G)(2).  These limitations apply with equal force in federal court.  *See Ayala v. Advocate Good Samaritan Hosp.*, No. 11 C 4019, 2011 WL 5981005, at *3-4 (N.D. Ill. Nov. 29,

---

[8]       It is undisputed that Plaintiff filed her IHRA claim with the Department on September 27, 2008.  (Pl's. 56.1 ¶ 70.)  Neither party has provided a copy of the Department's initial report dismissing her IHRA claim.

2011) (granting motion to dismiss where plaintiffs failed to file suit in federal court in accordance with the IHRA's limitations period); *see also Parish v. City of Elkhart*, 614 F.3d 677, 679 (7th Cir. 2010) (state law time limitations govern supplemental state law claims before the federal court). Here, Plaintiff filed her IHRA claim with the Department on September 27, 2008 but filed this case in federal court on October 20 of the same year, just 23 days later, well before the Department could have completed its investigation.

As Rabé filed this suit just weeks after filing a claim with the Department, the procedural scheme of the IHRA would be satisfied only if the Department had dismissed Plaintiff's claim prior to her filing suit in this court. Plaintiff has failed to present any evidence that she received a dismissal or right-to-sue letter from the Department prior to filing the present suit in federal court.[9] Because Plaintiff failed to exhaust her administrative remedies as required by the IHRA, Defendant's motion for summary judgment is granted as to Rabé's claims under the IHRA. Further, because the IHRA is Plaintiff's only basis for a discrimination claim based on sexual orientation, summary judgment for Defendant on the IHRA claims necessarily spells defeat for her sexual orientation claim, as well.

## III.    Retaliation Claim Under Title VII

Plaintiff alleges that United terminated her in retaliation for exercising her rights under Title VII. Defendant argues that it is entitled to judgment as a matter of law on Plaintiff's retaliation claim under Title VII. (Def.'s Mem. at 12-13.) United further claims that Rabé has waived her arguments

---

[9]    In fact, the only evidence Rabé has offered to support her assertion that she has exhausted her administrative remedies belies the notion that she satisfied the procedural requirements of the IHRA. Plaintiff offered a record of the Commission's review of her appeal from the Department's initial report, which shows that Rabé's appeal was due to the Commission on December 10, 2009. The IHRA generally requires any appeal to the Commission be brought within 90 days of the Department's dismissal. Ninety days prior to December 10, 2009 was September 11, 2009, which was nearly 11 months after Plaintiff commenced the present suit. The court concludes that Rabé's claim could not have been dismissed prior to her filing this civil suit against United.

in support of her retaliation claim by failing to raise them in her response to United's motion for summary judgment, and that therefore Count III has been abandoned. (Def.'s Reply at 5.)

In addressing United's argument, the court is guided by the "'well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.'" *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 389 (7th Cir. 2012) (quoting *Liberles v. Cook County*, 709 F.2d 1122, 1126 (7th Cir. 1983).) If a party fails to properly oppose an argument raised in a motion for summary judgment, the claim is deemed waived and the non-moving party will lose the motion. *De v. City of Chi.*, 912 F.Supp.2d 709 (N.D. Ill. 2012) (citing *Reklau v. Merch. Nat'l Corp.*, 808 F.2d 628, 630 n. 4 (7th Cir. 1986)). As Rabé's response brief failed to even address United's argument regarding retaliation, the court concludes that Rabé has waived and abandoned this claim. United is, therefore, entitled to summary judgment on Plaintiff's retaliation claim under Title VII.

## IV.    Harassment Claim Under IHRA

Plaintiff claims she was harassed by United based on her sexual orientation in violation of the IHRA, and defendant has moved for summary judgment. (Def.'s Mem. at 13-15.) As discussed above, the court need not assess the merits of Plaintiff's IHRA claims, as Rabé has not properly exhausted her administrative remedies under the Act's procedural scheme. But Plaintiff's harassment allegation also cannot survive summary judgment, because—as with her retaliation claim—she has failed to develop any arguments to refute United's position that it is entitled to judgment as a matter of law. For the foregoing reasons, United is entitled to summary judgment on Plaintiff's claim of harassment under the IHRA.

## V.    Discrimination Claims Under IHRA, Title VII, and ADEA

Plaintiff alleges that Defendant United discriminated against her by terminating her based on her age, national origin, and sexual orientation in violation of Title VII, the ADEA, and the IHRA. As explained earlier, the court need not assess the merits of Rabé's IHRA claims as she failed to

exhaust her administrative remedies prior to filing the instant suit. Nonetheless, because those claims largely overlap with her related claims under federal law, the court will address Plaintiff's IHRA claims alongside her Title VII and ADEA claims.

In analyzing discrimination claims under the IHRA, Illinois courts have adopted the framework used by federal courts in addressing discrimination claims under Title VII or the ADEA. *Zaderaka v. Ill. Human Rights Com'n*, 131 Ill.2d 172, 178, 545 N.E.2d 684, 687 (Ill. 1989). Under either the ADEA or Title VII—and, thus, under the IHRA as well—a plaintiff alleging discrimination may proceed under two methods of proof: direct or indirect. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (ADEA); *Smiley v. Columbia College Chi.*, 714 F.3d 998, 1002 (7th Cir. 2013) (Title VII). Plaintiff pursues her discrimination claims under both methods.

### A. Direct Method

Under the direct method, plaintiffs may survive summary judgment by presenting direct or circumstantial sufficient to establish or to create an inference of intentional discrimination. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010) (citing *Rudin v. Lincoln Land Cmty. Coll.*, 420 F. 3d 712, 721 (7th Cir. 2005)). Circumstantial evidence requires the finder of fact to infer intentional discrimination, while direct evidence is that which proves a fact without requiring an inference. *Lewis v. Sch. Dist. No. 70*, 523 F.3d 730, 742 (7th Cir. 2008). In practice, direct evidence would require something like an admission by United that it terminated Rabé because of her age, national origin, or sexual orientation; circumstantial evidence, meanwhile, allows Rabé to defeat a motion for summary judgment by "construct[ing] a convincing mosaic that allows a jury to infer intentional discrimination by the decisionmaker." *Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013) (citing *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2006)). Even where there is no evidence of animus on the part of the final decisionmaker, a plaintiff may prevail if she can establish that another employee, who did harbor such bias, exercised controlling influence (the "cat's paw" doctrine). *Johnson v. Koppers*, ___ F.3d ___, No. 12 C 2561,

16

2013 WL 4022294, *3 (7th Cir. Aug. 08, 2013).  Thus, when "a biased subordinate who lacks decision-making power uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action," the employer may be liable.  *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012) (internal quotation marks omitted).

In this case, Plaintiff's only apparent attempt to develop claims under the direct method rests on the cat's paw doctrine, and relates to her sexual orientation discrimination claim.  (Pl.'s Opp. at 12 n.16.)  Rabé implies that Fernandes, a United supervisor and former flight attendant, intentionally guided and influenced Defendant's investigation against the Plaintiff due to his bias against her based on her sexual orientation.  (*Id.* at 12.)  Plaintiff's only evidence of Fernandes' animus toward her, however, comes from comments he allegedly made in 1997 about homosexuality in general and its status in India.  (*Id.* at 2.)  There is no evidence that, at that time, Fernandes was aware of Plaintiff's sexual orientation.  Nor has Rabé presented any basis for a conclusion that Fernandes' views controlled or even influenced Jacobsen, the actual decisionmaker.  Even taking the evidence and all inferences in favor of Rabé, the record does not support Rabé's discrimination claims under the direct method of proof.

### B.    Indirect Method

Under the indirect method, Plaintiff may avert summary judgment by first establishing a prima facie case of discrimination under the *McDonnell Douglas* formula, which requires her to show (1) she is a member of a protected class; (2) she met United's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably.  *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 702 (7th Cir. 2012).  Where, however, a plaintiff's claim of discrimination is based on disparate punishment, "the second and fourth prongs of *McDonnell Douglas* merge."  *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 728 (7th Cir. 2004).  In such cases, "there is no question that the employee failed to meet his employer's expectations.  Instead, the plaintiff must establish that he

17

received dissimilar—and more harsh—punishment than that received by a similarly situated employee who was outside the protected class." *Id.*

The "similarly situated" test is a flexible inquiry whose requirements vary from case to case, but in each instance its purpose is to determine whether there are enough common factors between a plaintiff and a comparator—and few enough confounding ones—to allow for a meaningful comparison in order to divine whether discrimination was at play. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404-06 (7th Cir. 2007). "Such a showing normally entails establishing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Snipes v. Ill. Dep't of Corrs.*, 291 F.3d 460, 463 (7th Cir. 2002) (internal quotation marks omitted).[10] The similarly-situated inquiry is a search for a substantially similar employee, however, not a "clone." *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010). For instance, a "difference in job title alone is not dispositive" where comparators' similarities nonetheless predominate. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007).

Once a plaintiff has established a prima facie case, the defendant may identify a legitimate, non-discriminatory justification for the adverse action. *Stockwell v. City of Harvey,* 597 F.3d 895, 901 (7th Cir. 2010). Where the defendant-employer articulates a legitimate reason for its action, the plaintiff then faces the burden of producing evidence sufficient to show that reason to be pretextual. *Id.*

---

[10] Plaintiff argues in her reply brief that summary judgment is inappropriate where the court is required to address whether the plaintiff and a comparator are "similarly situated." Yet, as United points out, in the case on which Rabé relies for this point, the Seventh Circuit affirmed summary judgment on the "similarly situated" issue. *Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009).

### 1.    Prima Facie Case

The parties agree that Rabé has satisfied the first and third prongs of the prima facie case: she is a member of multiple protected classes (she is over forty years of age, she is a lesbian, and she is a French national) and her termination constitutes an adverse employment action.  (Pl.'s 56.1 ¶ 2; Def.'s Mem. at 8-10.)

Defendant urges that Rabé's use of the BP-3 tickets violated United's legitimate expectations of employment.  (Def.'s Mem. at 8-9.)  But whether Rabé met United's expectations is not dispositive here, as she may still establish a prima facie case if other workers who engaged in the same misconduct were treated more favorably.  Rabé contends that she has made such a showing: that she was punished more harshly than similarly situated coworkers who also violated United's BP-3 travel policy, but were not members of her protected classes.[11]  (Pl.'s Opp. at 10-11.) In support, Plaintiff refers to forty-six Hong Kong employees whom, she claims, violated the BP-3 travel requirements, among whom only Plaintiff and Wissig were fired.[12]  (Flight Records, Ex. I to Pl.'s App. at DEF1495-1582; J.W. Termination Letter, Ex. 4 to Tab J, Def.'s Mem.)  Plaintiff provides no explanation of the document in the record, which appears to be flight records for other Hong Kong employees who failed to complete legs of BP-3 travel.  Plaintiff asserts (without citing to any evidence) that, unlike Rabé, none of these employees were disciplined.  (Pl.'s Opp. at 10.)  She provides no evidence as to whether these individuals were members of her protected classes, nor does she indicate how many, like Plaintiff, failed to complete legs of BP-3 travel on multiple

---

[11]    Discovery in this case was protracted.  Plaintiff raised numerous concerns regarding United's compliance, and the court took care to ensure Plaintiff had access to all available documents likely to lead to relevant evidence, granting several motions to compel:  November 13, 2013, (Minute Entry [127], Nov. 13, 2013), December, 6, 2012, (Motion Hearing [132], Dec. 6, 2012), and February 1, 2013.  (Minute Entry [144], Feb. 1, 2013.)

[12]    Plaintiff also refers to two lists she received from United: (1) fifteen flight attendants that violated Article 5, ten of whom were not terminated; (2) eleven flight attendants who violated Article 35, none of whom were terminated.  (Pl.'s Opp at 10-11.)  Plaintiff does not cite to any evidence to support these numbers, and the court could not find the lists in the record.

occasions. Further, Rabé does not suggest that United management was aware of these alleged violations at the time of her investigation and termination.[13] This evidence is insufficient for several reasons: Plaintiff offers no evidence that these employees were not members of her protected classes, that they worked under the same supervisor that she did, or that they were investigated at all, let alone by the same decisionmaker.

Plaintiff acknowledges that Articles 5 and 35 encompass a broad swath of activity. For instance, Plaintiff refers to two flight attendants who also violated Article 35 of United's Articles of Conduct and were investigated by Jacobsen: Jose Silva in 2010 and Joyce Noland in 2007.[14] (Silva Investigation Records, Ex. I to Pl.'s App. at DEF3685-98) The record shows, however, that Silva and Nolan's violations were quite different than Rabé's: Silva violated Article 35 by sending threatening e-mails to a coworker, while Noland's violation was for being intoxicated in uniform. (Noland Investigation Records, Ex. I to Pl.'s App. at DEF3668-3669.) Because Rabé has failed to show that any of her alleged comparators engaged in materially similar conduct without such differentiating factors as would distinguish their conduct or United's treatment of them, she has failed to properly establish any of them as a comparator.

Plaintiff does refer to two additional potential comparators by name: Nancy Johnson and Jennifer Wissig. (*Id.* at 10-11.) Johnson, a flight attendant with United since 1972, received a 30-day suspension in 2004 for allegedly violating Article 5 by failing to complete scheduled travel on a BP-3 pass. (Decl. of Stephen Stoute, Ex. J to Pl.'s Opp.) Rabé and Johnson were not, however, similarly situated, as Johnson did not deviate from the BP-3 pass's assigned routing, did not fail to

---

[13]     Notably, in Plaintiff's own case, the investigation of her BP-3 use began in response to her request for parking reimbursement in Los Angeles.

[14]     Although Plaintiff suggests that Jacobsen was the hearing officer for Noland's investigation, the evidence she cites to for that proposition, a Letter of Charge from Supervisor Jimmy Chiang, does not mention Jacobsen. (Pl.'s Opp. at 11 n.14; Letter from Chiang to Noland of 10/3/07, Ex. I to Pl.'s App.)

cancel any portions of her BP-3 travel, did not hold a positive space seat out of inventory, and only misused the BP-3 policy on a single occasion. (*Id.*) Further, Rabé offers no evidence as to Johnson's age, national origin, or sexual orientation.

Jennifer Wissig, Plaintiff's former base manager in Hong Kong, was neither suspended nor terminated for allegedly violating United's business travel policies in July 2008. (J.W. Termination Letter, Ex. 4 to Tab J, Def.'s Mem.) When she violated the policy again in November 2008, however, United terminated Wissig. (*Id.*) While it is true—as Plaintiff argues—that job titles and rank alone are not dispositive of the "similarly situated" issue, the record here does not support Plaintiff's contention that Wissig and Rabé were, in fact, substantially similar. Most significantly, Wissig and Plaintiff shared neither the same supervisor nor the same decisionmaker. Both of Wissig's alleged violations were investigated by Greg Orth (*Id.*), while Rabé was investigated by Jacobsen. Moreover, it is not clear that Wissig and Rabé were treated disparately: both were terminated for violating travel United's policy twice.

Plaintiff urges that whether a comparator is similarly situated is a fact-specific inquiry and inappropriate for summary judgment. (Pl.'s Opp. at 9.) Yet the record is wholly deficient to support the notion that Rabé and any of the individuals she offers as comparators were, in fact, alike in all material respects. Plaintiff believes she was fired for discriminatory reasons, and she may indeed have been used as an "example"–but she offers no evidence that United's Hong Kong management was aware of and deliberately ignored similar misconduct by others. Thus, Rabé cannot show that there is a similarly situated person who was treated more favorably than her by United; and she has failed to establish a basis from which the court can draw an inference of discrimination.

United is entitled to judgment as a matter of law on Plaintiff's claims of discrimination under Title VII, the ADEA, and the IHRA.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [110] is granted.

ENTER:

Dated:  September 30, 2013                      _____

REBECCA R. PALLMEYER
United States District Judge

22